IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| KEVIN L. DOUGHERTY, Individually and on Behalf of All Others Similarly Situated, | Civ. No. |
| | Hon. |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES |
| ESPERION THERAPEUTICS, INC. and TIM M. MAYLEBEN, | LAWS |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Kevin L. Dougherty ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon an investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Esperion Therapeutics, Inc.'s ("Esperion" or the "Company") Securities and Exchange Commission ("SEC") filings, Company news releases and conference calls, public statements issued by defendants, securities analyst reports, media reports and industry reports.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE FRAUD

1.    This is a securities fraud class action on behalf of all persons who purchased Esperion common stock between August 18, 2015 and September 28, 2015, inclusive (the "Class Period"), against Esperion and its Chief Executive Officer ("CEO") ("Defendants") for violating §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Plaintiff's case is a simple one – Defendants falsely portrayed what occurred at an early August 2015 meeting between Esperion and the U.S. Food and Drug Administration ("FDA").  A month later, as the market understood the true facts concerning what occurred at the meeting, the price of Esperion's stock collapsed.

3.     Esperion is a pharmaceutical company that focuses on developing and commercializing oral low-density lipoprotein cholesterol ("LDL-cholesterol") lowering therapies for patients with hypercholesterolemia.  Esperion's lead product candidate is ETC-1002, a once-daily small molecule designed to lower LDL-cholesterol levels.  In fact, getting approval for and commercializing ETC-1002 has been the singular focus of Esperion's operations.  According to Esperion, ETC-1002 is designed to lower LDL-cholesterol while avoiding the side effects associated with other LDL-cholesterol lowering therapies on the market.  While statins are the current standard of care for lowering LDL-cholesterol, Esperion is developing ETC-1002 to treat patients who are already taking statins and need further relief or are intolerant to statins.

4.     By the beginning of August 2015, Esperion completed ETC-1002's Phase 2b clinical trials and was meeting with the FDA to discuss moving forward with the Phase 3 segment of the approval process.  Up to that point, Esperion never mentioned to investors that it would need to conduct a lengthy and expensive

cardiovascular outcomes trial ("CVOT") prior to ETC-1002 being approved.  On August 17, 2015, stating that it understood the outcome of its meeting with the FDA was important to investors, Esperion decided to relay to investors material events from the early August 2015 meeting.  The Company emphasized that during its meeting with the FDA it was informed by the FDA that the Company indeed would ***not*** have to complete a CVOT to gain approval of ETC-1002.  Esperion also informed investors that it had a "'clear regulatory path forward for development and approval of ETC-1002.'"

5.     A little over a month later, after the market closed on September 28, 2015, Esperion reversed course about the early August 2015 FDA meeting – stating in a September 28, 2015 news release that the FDA had actually "encouraged the Company to initiate a cardiovascular outcomes trial promptly" and it may be necessary to have a completed CVOT prior to approval.  Investors immediately recognized the differences in the two characterizations of the same meeting and reacted accordingly to having been misled by Esperion.

6.     When the market closed on September 28, 2015, Esperion stock traded at $35.09 per share.  After the market closed, the Company revealed the truth and the next day Esperion's stock opened at $26.00 per share.  By the time the market digested the truth on September 29, 2015, the price of Esperion shares

had fallen almost 50% from its previous close to merely $18.33 per share on unusually high volume.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

8.      This Court has jurisdiction over the matter pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

9.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Esperion has its clinical operations and headquarters in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

10.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market.

## THE PARTIES

11.     Plaintiff Kevin L. Dougherty purchased Esperion common stock as set forth in the attached certification and has been damaged thereby.

12.     Defendant Esperion is a U.S.-based biopharmaceutical company.  It maintains its corporate headquarters and clinical development operations at 3891 Ranchero Drive, Suite 150, Ann Arbor, Michigan 48108.  Throughout the Class Period, Esperion's common stock traded under the ticker "ESPR" on the NASDAQ, an efficient market.

13.     Defendant Tim M. Mayleben ("Mayleben") is, and at all relevant times was, Esperion's CEO, President and a member of Esperion's Board of Directors.  Mayleben has extensive experience in the biopharmaceutical industry.  Prior to becoming Esperion's CEO, Mayleben was President and CEO at Aastrom Biosciences; he owned ElMa Advisors, a life science and healthcare advisory and investment firm; he was Chief Operating Officer ("COO") and a director of Nighthawk Radiology Holdings, Inc.; and he was COO and Chief Financial Officer of the original Esperion Therapeutics.  He is also an advisor to, investor in, and member of the board of a number of other life science companies, including Kaleo Pharma, Lycera Corporation and Marinus Pharmaceuticals.  In 2013, Mayleben was awarded nearly three million options as part of his performance compensation.  In 2014 he was a beneficial owner of over 400,000 shares of Esperion stock.  During the Class Period, Mayleben's performance compensation was based on, among other things, changes in the market price of the Company's common stock,

development, clinical or regulatory milestones and acquisitions of strategic transactions.

## **BACKGROUND**

14.     Esperion was incorporated in January 2008 and began operating in April 2008.  The Company has never received approval for and commercialized a drug compound.  As a result, it has never sold any products or generated revenue.  As the Company has acknowledged, subsequent to its incorporation, substantially all of its efforts and financial resources have been focused on developing ETC-1002.    In  this  respect,  Esperion  and  its  executives  are  eager  to  finally commercialize a drug, and ETC-1002 is its leading candidate.   According to Esperion, ETC-1002 is a first-in-class, orally available, once-daily LDL-cholesterol lowering small molecule therapy designed to target known lipid and carbohydrate metabolic pathways to lower levels of LDL-cholesterol and to avoid many of the side effects associated with existing LDL-cholesterol lowering medications.

15.     Elevated LDL-cholesterol is a significant risk factor in cardiovascular disease.  LDL-cholesterol is considered the bad cholesterol, because it contributes to plaque deposits that clog arteries and make them less flexible, a condition known as atherosclerosis.  Heart attacks and strokes are caused by plaque forming and blocking the narrowed arteries.   Also, a condition called peripheral artery

disease can develop when plaque buildup narrows an artery supplying blood to the legs. The Center for Disease Control estimates that 71 million adults in the United States have elevated levels of LDL-cholesterol.

16.     Statins are currently the standard of care for lowering LDL-cholesterol for approximately 35 million patients in the United States. The most noteworthy statin is Lipitor, which is the most prescribed LDL-cholesterol lowering drug in the world and the best-selling pharmaceutical drug in history. Despite the broad use and the benefits of statin therapy, according to Esperion, there is a significant patient population unable to tolerate statins due to muscle pain or weakness, memory loss or increased glucose levels. Esperion estimates that between 2 and 7 million U.S. adults are intolerant of statin therapy, as the muscle pain or weakness associated with the use of statins is unbearable. Esperion also believes that the size of the statin-intolerant market will expand when better non-statin therapies become available.

17.     As such, Esperion's goal has been to develop ETC-1002 to treat the patient population that is unable to tolerate statins. Esperion informed investors that the FDA communicated to the Company that patients defined as statin intolerant are those unable "to tolerate at least two statins, one of which was taken at the lowest approved dose, due to skeletal muscle pain, aches, weakness or cramping, that manifested or increased during statin therapy and stopped upon

discontinuation of statin usage." Along with the 2 to 7 million patients diagnosed as being statin intolerant, according to Esperion, the market would grow because 25% of patients currently on statins have muscle-related side effects. The Company told investors that "in the presence of a safe and effective non-statin, oral, once-daily, small molecule LDL-C lowering therapy, the statin intolerant market could grow substantially."

18.     Esperion has also emphasized its plan to commercialize ETC-1002 to treat patients as an add-on therapy. In other words, ETC-1002 is to be marketed to patients with hypercholesterolemia who are unable to reach their recommended LDL-cholesterol goals despite the use of a statin or other LDL-cholesterol lowering therapy.

**Development of ETC-1002**

19.     ETC-1002 is differentiated from statin therapies because it is active during an earlier step in the cholesterol biosynthetic pathway. According to Esperion, "ETC-1002 is converted to the CoA form in the liver and works primarily by inhibiting the ATP citrate lyase (ACL) enzyme upstream of HMG-CoA reductase, whereas statins directly inhibit the rate-limiting enzyme, HMG-CoA reductase. Reductions in LDL-cholesterol levels resulting from statin therapy are ultimately due to reduced cholesterol synthesis and an increase in the number of LDL receptors in the liver." A side effect to using statins, however, is that they

- 8 -

also inhibit cholesterol synthesis in skeletal muscle tissue, which is the likely cause of muscle fatigue and soreness in some patients who take statins. ETC-1002 does not cause the same reaction in muscles because, while it reduces cholesterol synthesis and increases the number of LDL receptors in the liver, it is not active in skeletal muscle tissue.

20.    Since being incorporated in January 2008, Esperion's entire operation has been devoted to the development of ETC-1002. Prior to the beginning of the Class Period, Esperion had studied ETC-1002 in ten completed clinical trials, including three Phase 1 studies, four Phase 2a studies, two Phase 2b studies, and one exploratory Phase 2 study. Each trial, according to the Company, was successful and demonstrated significant average LDL-cholesterol reductions. ETC-1002 was determined to be well-tolerated across all completed studies.

21.    On March 17, 2015, Esperion announced positive top-line results from the ETC-1002-009 clinical trial. The purpose of that clinical trial was to further evaluate the potential of ETC-1002 to provide incremental LDL-cholesterol lowering for patients already taking a statin and not at their LDL-cholesterol goal. The ETC-1002 patients in the study achieved 17% and 24% incremental reductions in LDL-cholesterol compared to patients on statin therapy alone.

22.    On July 28, 2015, the Company announced positive top-line results from the ETC-1002-014 clinical trial, which was the Phase 2 exploratory safety,

parallel dose clinical study. The purpose of the study was to evaluate the LDL-cholesterol lowering efficacy of ETC-1002 monotherapy versus a placebo in patients with both hypercholesterolemia and hypertension. The secondary end-point was to assess the tolerability and safety of ETC-1002. According to Esperion, the clinical study showed that ETC-1002 appeared "safe and well-tolerated, with no reports of muscle-related adverse events or LFT elevations."

23. In early August 2015, Esperion executives attended an ETC-1002 End-of-Phase 2 meeting with the FDA. The purpose of the meeting was to illicit feedback and advice from the FDA on moving forward with the Phase 3 segment of the approval process. According to Esperion's August 17, 2015 news release, the FDA confirmed that LDL-cholesterol remains an acceptable clinical surrogate endpoint for the approval of ETC-1002 in patient populations who have a high unmet medical need, including patients with heterozygous familial hypercholesterolemia ("HeFH") or clinical atherosclerotic cardiovascular disease ("ASCVD"), who are already taking maximally tolerated statins yet require additional LDL-cholesterol reduction. The news release did not mention the FDA's position on the approval of ETC-1002 for use on statin-intolerant patients. Given this new "'clear regulatory path forward for development and approval of ETC-1002,'" Esperion remained on track to initiate the ETC-1002 Phase 3 development program by the end of 2015.

**Financing**

24.     The number of clinical trials and other studies Esperion has sponsored in its efforts to gain approval for and eventually commercialize ETC-1002 are extremely costly.  To date, Esperion has earned no revenue and has sustained net losses of $36.4 million, $26.1 million and $11.7 million for 2014, 2013 and 2012, respectively.   As such, Esperion funds its operations through funding from investors, including sales of preferred stock, convertible promissory notes and warrants, and public common stock offerings.  On July 1, 2013, the Company completed its initial public offering of common stock, raising $72.2 million in net proceeds.  On October 21, 2014, the Company completed a follow-on offering of common stock, raising $91.6 million in net proceeds.  In its 2014 Form 10-K, Esperion acknowledged that it would need further funding to support its continuing operations.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

25.     Subsequent to its meeting with the FDA concerning ETC-1002's Phase 2 results, Esperion issued a release after the market closed on August 17, 2015, announcing that the Company was "on track to initiate the ETC-1002 Phase 3 development program" in 2015.  According to the news release, "[t]he ETC-1002 Phase 3 development program will include clinical studies in patients with ASCVD

and HeFH. The study designs will be finalized once minutes from the FDA meeting are received."

26. Both the Company and Mayleben assured investors that the FDA would not require a completed CVOT prior to approving ETC-1002. The Company stated: "***Based on feedback from the FDA, approval of ETC-1002 in the HeFH and ASCVD patient populations will not require the completion of a cardiovascular outcomes trial (CVOT)***."[1]

27. Later in the release, Mayleben reiterated that a CVOT would not be required to be completed for approval and also misleadingly stated that there was a clear regulatory path for approving ETC-1002: "'***We have a clear regulatory path forward for development and approval of ETC-1002, an oral, once-daily treatment option for these patients that require additional LDL-C lowering***.'"

28. Later that evening, the Company held a conference call to further clarify the news release. The reason for the release and the conference call, according to Mayleben, was that "some of the information we learned last week at our End-of-Phase 2 meeting about the regulatory path forward for [ETC-]1002 ***was important for you to know sooner rather than later***, even though we don't have meeting minutes back from the FDA." Mayleben also stated: "And as we digested the meeting last week, clearly the thing that we had learned last week that we

---

[1]    Here as elsewhere emphasis has been added unless otherwise noted.

thought was significant was that ***ETC-1002, one, has a clear path to approval*** and it's in the patient population, this high unmet medical need patient population. And we thought that that was significant enough that it warranted speaking about it sooner rather than later."

29.   During the August 17, 2015 conference call to discuss the FDA meeting, Mayleben again informed investors that the Company was "***pleased with the outcome of the End-of-Phase 2 meeting with the FDA***" and that there now was "***a clear regulatory path forward.***"  Mayleben also reiterated that "***[w]e know that [ETC-]1002 will not require a CV outcomes trial to be completed prior to approval in patients with heterozygous FH and ASCVD***, those patient populations that FDA considers to have an appropriate benefit/risk ratio."

30.   During the conference call, an analyst from UBS asked for clarification on the FDA's position on ETC-1002's Phase 3 patient population, as it was narrower than what the market expected because it did not include patients who were intolerant to statins.  In response, Mayleben responded:

> We, unfortunately are not anywhere in a position that we can comment on FDA's policy or perspectives.  The only thing that we can really say is what ***they've told us about the development of ETC-1002 and the regulatory path to approval there***.

31.   Analysts covering Esperion found the August 17, 2015 release and follow-up conference call to be a mixed bag of information.  On the one hand, analysts were slightly disappointed because they expected the Phase 3 study patient

population to be broader than the Company announced, as the Company was also trying to get ETC-1002 approved for patients who were statin intolerant. On the other hand, analysts found the news that Esperion would not have to complete an expensive and lengthy CVOT prior to approval and that ETC-1002 had a clear path to approval to be positive.

32.     For example, after the call, on August 17, 2015, a J.P. Morgan analyst report stated:

> Esperion provided an earlier-than-expected update from the end of phase II meeting with the FDA this afternoon announcing that, ***importantly, the FDA will not require a pre-approval CVOT for ETC-1002***. We view this as a clear positive and should remove a significant regulatory overhang on the stock. That said, the initial label will be narrower than previously thought (although perhaps increasingly expected with the stock at recent levels). Specifically, the initial patient populations not requiring a CVOT will be HeFH and those with clinical atherosclerotic cardiovascular disease (aka secondary prevention) on max tolerated statin, however we believe the label can be broadened longer-term. While the phase III program will be adjusted for this feedback, on the call mgmt noted they remain on track to start phase III by the end of 2015. Net-net, we believe today's good news (no preapproval CVOT) trumps the bad news (narrower initial patient pop) and remain OW ESPR shares.

33.     A Credit Suisse analyst also found the Company's statements concerning the CVOT to be positive, as an August 17, 2015 Credit Suisse report stated:

> Most importantly, it appears clear now that the FDA is comfortable approving ETC-1002 for higher-risk patients based on its ability to reduce LDL-c and ***the cardiovascular outcomes trial (CVOT) can be completed after the product has entered the market***.

34.    In an August 17, 2015 analyst report, UBS also reported that the statements concerning the timing of the CVOT were positive:

>    *FDA feedback helps resolve some investor concerns, notably that there is a clear path forward for approval prior to having to show CVOT data*.

35.    A *FierceBiotech* article evaluating Esperion's announcement was also published on August 17, 2015 after the market closed.  According to the article, the news that the FDA was not going to require a long-running CVOT ahead of approval caused an increase in Esperion's stock price after the market closed. Highlighting the positive implications of a CVOT not being required, the article explained that "[o]verhanging all of these drugs has been a persistent fear that regulators would require a long-running cardiovascular outcomes trial to prove the therapy works as expected in improving patients' health."

36.    The following day, on August 18, 2015, a JMP Securities analyst report reiterated the importance of the information the Company and Mayleben provided the previous day:

>    Yesterday *Esperion announced that the FDA confirmed at the ETC-1002, end-of-Phase 2 meeting that approval would not require the completion of a cardiovascular outcomes trial (CVOT).  We view this as a clear positive, addressing without ambiguity the primary point of debate for the stock in recent weeks*.  The company also confirmed that, in line with our/consensus expectations and consistent with the Praluent label, the initial indication pursued will be in patients with familial hypercholesterolemia and atherosclerotic cardiovascular disease (*i.e.*, secondary prevention patients).

37.    The statements by Esperion and Mayleben in ¶¶26-30 were made with knowledge of the falsity and/or with reckless disregard of the truth because at the time they were made Defendants had already met with the FDA and were aware of what the FDA had communicated to them less than a week prior to making the statements.  As revealed at the end of the Class Period, what the FDA actually communicated to Defendants, which was concealed from investors until September 28, 2015, was that there was no clear path to approval for ETC-1002 and the FDA had encouraged the Company to initiate a CVOT and that completion of a CVOT could be necessary prior to approval.

## INVESTORS BEGIN TO LEARN THE TRUTH

38.    After the market closed on September 28, 2015, the Company and Mayleben finally began to reveal the truth about their discussion with the FDA. The Company issued a release that was inconsistent with what it had earlier stated was the FDA's position concerning the CVOT.  Instead of the message that the FDA did not seem concerned with a CVOT, which was conveyed in August, the September news release suggested something different:

> For patients on maximally tolerated statin therapy who require additional LDL-C lowering, Esperion will plan to conduct efficacy and long-term safety trials.  ***FDA has encouraged the Company to initiate a cardiovascular outcomes trial promptly, which would be well underway at the time of the New Drug Application submission and review, since any concern regarding the benefit/risk assessment of ETC-1002 could necessitate a completed cardiovascular outcomes***

- 16 -

*trial before approval*.  Esperion intends to initiate a global long-term safety study for ETC-1002 by the end of 2015.

39.     Later that evening, the Company and Mayleben held a conference call for investors to discuss the minutes of the FDA meeting and the content of the news release issued earlier that day.   During the conference call, Mayleben acknowledged that the safety profile of ETC-1002 was an issue for some people:

> I think as you have heard us say, we have a lot of confidence in the profile of 1002, both from a safety and from an efficacy standpoint, as we have looked at both the low and moderate dose and compared low and moderate doses of 1002 on top of low versus moderate doses. Based on that, we have a lot of confidence.  I know obviously who others [sic] don't understand the profile of 1002 as well as we do have expressed some concerns about that.  But I think the only way to address any of that is to generate the data.  So we're going to generate the data.  We're going to initiate the study next quarter and expect to have that data for everybody in the mid-part of 2016.

40.     Analysts who participated on the call also recognized the shift in the Company's stance concerning the FDA's desire for CVOT data.   Mayleben's response acknowledged a change in the language used a month earlier in August:

**Jessica Fye** – *JPMorgan – Analyst*

> Hey guys.  Thanks for taking my questions.  I have a few. When you say in the press release the FDA sort of urged you to start the outcomes study as soon as possible, since any concern regarding the benefit/risk of 1002 could necessitate a completed cardiovascular outcomes trial before approval, I guess can you just talk about what that means?  I think previously you had outlined a path to market without outcomes data, at least in these sort of higher-risk patients. I'm curious if this is because you want to go into monotherapy and that's where outcomes come in.  Can you just elaborate on that phrasing in the press release?

**Tim Mayleben** – *Esperion Therapeutics, Inc. – President and CEO*

> Sure. So, the language there is, as you could see, ***it is slightly different from the language that we used in the original announcement*** back in August and I think what it reflects is, as I was highlighting earlier, about LDL as an accepted surrogate, whether it will continue to be an accepted surrogate.

41.     Other statements Mayleben made concerning the CVOT during the conference call were also at odds with the Company's prior statements:

> I think as you saw in the press release, we have a keen interest, as does FDA, in getting a cardiovascular outcomes trial underway.
>
> \*       \*       \*
>
> In particular, one of the important dialogues that we will have with them over the next several months is going to be on the appropriate design and sizing of the CV outcomes study. We just don't know and I don't want to comment any further until we have specifics of that and are confident in the design and the scope of it relative to discussions that we will have had with the regulatory authorities.

42.     Subsequent to the conference call, analysts and the media immediately recognized that the August 17, 2015 statements were misleading. On September 28 and 29, 2015, analysts stated the following:

> **UBS**
>
> However, we believe ***the update (including a more cautious outlook on regulatory risk) implies far greater uncertainty than was reflected in our previous model***, and hence are lowering our PT to $69, which reflects 30% POS for ETC-1002 (65% previously). . . .
>
> . . . Investors are likely to focus on updated language that suggests CVOT data "could" be required prior to approval.
>
> \*       \*       \*

We have revised our model to reflect today [sic] update, with uncertainty on the path forward and timelines driving our lower probability of success and new price target.

**Credit Suisse**

ESPR management's update to investors following receipt of the official End-of-Phase 2 Meeting Minutes from the FDA leaves us somewhat confused, ***as the company's message and plan now appears quite different than what it initially said following the meeting***.

43.     Chardan Capital analyst Gbola Amusa's critique of the Company was even harsher, recognizing the fact that not only did Esperion's story change, but it changed to include information it was aware of during the August 17, 2015 news release and conference call:

End-of-phase 2 (EOP2) meeting minutes to us are worse than consensus expected, and ***even inexplicably inconsistent with prior 17 August 2015 EOP2 commentary***, which already represented missed guidance.  On Monday, after market close, Esperion released further details on its August EOP2 meeting with the US FDA.  In reading the 17 August and 28 September EOP2 press releases together, for us the question must be raised as to ***why ESPR is newly providing information to the market that possibly could have been communicated with its 17 August release***.  Regardless, we believe we are gaining visibility on the likelihood of multi-year delays for ETC-1002 relative to 2018 consensus launch expectations, since: 1) ESPR acknowledges on its conference call (but not in its press release) that it is starting ***new phase II trials investigating ETC-1002*** use with maximally tolerated statins, a setting where we doubt ETC-1002 works, 2) phase III trials will not start until at least 2016 (versus prior guidance of 2H2015), and 3) ESPR now states "any concern regarding the benefit/risk assessment of ETC-1002 could necessitate a completed cardiovascular outcomes trial before approval.

44.     On September 29, 2015, a *StreetInsider.com* article stated: "To us, this is more than 'slightly different' from August commentary and is ominous given our concerns on the benefit/risk profile of ETC-1002 . . . ."

45.     A September 30, 2015 *StreetInsider.com* article noted Gbola Amusa's skepticism of the Company given its prior misleading statements.   The article quoted Amusa as stating:

> "[W]e note firstly that ESPR management has to us missed guidance a number of times, and even in our view ***produced markedly different press releases (on 17 August and on 28 September) surrounding the same August 2015 end-of-phase II meeting with the FDA***.  So, the reality of the ultimate regulatory path forward could be worse than has been accepted by the market and by us . . . ."

46.     A September 29, 2015 *FierceBiotech* article juxtaposed Esperion's and Mayleben's August and September statements concerning the same topics:

> Esperion Therapeutics ($ESPR) is developing a cholesterol-lowering pill that management believes could play spoiler to this year's high-profile, blockbuster-in-waiting new injections.  But key to the bull case for Esperion is whether the FDA will require the company to run a long, costly safety study before approving its cardio drug.  And, parsing a vague update on the drug's future, Wall Street is turning bearish.
>
> *     *     *
>
> ***Which is to say "will not" turned into "could" in about a month's time, and that, to investors, is an alarming evolution***.  Esperion's shares plunged about 10% on Monday and then tumbled another 28% after hours.

47.     In response to this news, Esperion's stock price plummeted from $35.09 per share to $18.33 per share, a one-day decline of 48% on massive volume

of 9.9 million shares, or almost eight times the average daily trading volume during the Class Period.  Indeed investors understood that Defendants misled them about ETC-1002's approval path forward.   As the *FierceBiotech* article put it, to investors that was an "alarming evolution."

## LOSS CAUSATION/ECONOMIC LOSS

48.     During the Class Period, Defendants made false and misleading statements by misrepresenting the future prospects for Esperion's drug ETC-1002 and engaged in a scheme to deceive the market.  Defendants' conduct artificially inflated the price of Esperion common stock and operated as a fraud or deceit on the Class.   Later, when Defendants' prior misrepresentations and omissions became apparent to market participants, the price of Esperion common stock plummeted, as the prior artificial inflation was released from the stock.  As a result of their purchases of Esperion common stock during the Class Period, Plaintiff and members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

49.     Defendants' misleading statements and omissions, identified herein at ¶¶26-30, had the intended effect and caused Esperion's common stock to trade at artificially inflated levels during the Class Period.

50.     As a direct result of the disclosures that began after the market closed on the evening of September 28, 2015, which are detailed in ¶¶38 and 39,

Esperion's common stock price suffered a significant decline.  As set forth in the chart below, by the time the market closed on September 29, 2015, the price of Esperion common stock had plunged to $18.33 per share – a one-day decline of nearly 48% on volume of over 9.9 million shares.



51.    The decline in Esperion's common stock price on September 29, 2015 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market.  The timing and magnitude of Esperion's stock price decline negates any argument that the loss suffered by the Class (as defined below) was due to changed market conditions, macroeconomic or

industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct.  On September 29, 2015, the change in the NASDAQ composite index was 0.58% and the NASDAQ Biotechnology index was 0.57%.

52.     The economic loss suffered by Plaintiff and the other members of the Class was a direct result of Defendants' fraudulent scheme to inflate Esperion's common stock price and the subsequent decline in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

53.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Esperion common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

54.     At all relevant times, the market for Esperion common stock was efficient for the following reasons, among others:

(a)     Esperion common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Esperion filed periodic public reports with the SEC; and

(c)     Esperion regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of news releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Esperion common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

56.    The members of the Class are so numerous that joinder of all members is impracticable.   The Company's stock is actively traded on the NASDAQ and there are over 22 million shares of Esperion common stock outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Esperion or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.    Common questions of law and fact predominate and include: (i) whether Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false; and (iv) whether Defendants' statements and/or omissions artificially inflated the price of Esperion common stock and the extent and appropriate measure of damages.

58.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

61.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

62.     Defendants are liable for making false statements and failing to disclose adverse facts known to them about Esperion.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who transacted in Esperion common stock during the Class Period was a success, as it: (i) deceived the investing public regarding Esperion's business; (ii) artificially

inflated the price of Esperion common stock; and (iii) caused Plaintiff and other Class members to transact in Esperion common stock at inflated prices.

63.    During the Class Period, Defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified in ¶¶26-30 above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their transactions in Esperion common stock during the Class Period.

65.    Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged

and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Esperion's business and operations as specified herein.

66.     The Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon those who transacted in Esperion common stock during the Class Period.

67.     The Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Esperion's operating condition from the investing public and supporting the artificially inflated price of its common stock.

68.     As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Esperion's common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in the Defendants' public statements during the Class Period, Plaintiff and the other Class members purchased Esperion common stock during the Class Period at artificially high prices and were ultimately damaged thereby.

69.     At the time of said misrepresentations and omissions, Plaintiff and other Class members were ignorant of their falsity, and believed them to be true. Had Plaintiff and other Class members and the marketplace known the truth regarding the problems that Esperion was experiencing, which Defendants did not disclose, Plaintiff and other Class members would not have transacted in Esperion common stock, or, if they had transacted in Esperion common stock during the Class Period, would not have done so at the artificially inflated prices they paid.

70.     By reason of the foregoing, Defendants have violated §10(b) of the 1934 Act and Rule 10b-5.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Esperion common stock.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

72.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

73.     Defendant Mayleben acted as a controlling person of Esperion within the meaning of §20(a) of the 1934 Act:

(a)     By reason of his position as an executive officer and director, his participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, Mayleben had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading;

(b)     Mayleben participated in conference calls with investors and was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading before or shortly after these statements were issued and had the ability

to prevent the issuance of the statements or cause the statements to be corrected; and

(c)     Because of his position as CEO and director, Mayleben directly participated in the Company's management and was directly involved in Esperion's operations.  Mayleben also controlled the contents of Esperion's public filings, press releases, conference calls, and presentations to securities analysts and the investing public.  Mayleben prepared, reviewed and/or was provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

74.     Defendant Esperion controlled defendant Mayleben and all of its employees.

75.     By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under

Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 12, 2016                    Respectfully submitted,

THE MILLER LAW FIRM, P.C.


*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
950 West University Drive, Suite 300
Rochester, MI  48307
T:  (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Ryan A. Llorens
655 West Broadway, Suite 1900
San Diego, CA 92101
T:  (619) 231-1058
ryanl@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Paul J. Geller
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
T:  (561) 750-3000
pgeller@rgrdlaw.com

HOLZER & HOLZER, LLC
Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
T:  (770) 392-0090
cholzer@holzerlaw.com
mdees@holzerlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| ESPR | 8|18|15 | 200 | $72.72 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| ESPR | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___7___ day of ___Jan___, 2016 in ___Sarasota___, ___Florida___.
                                                    City              State

(Signature) X _____

(Print Name) ___Kevin L. Dougherty___