UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN L. DOUGHERTY, ET AL.,

        Plaintiffs,                 No. 16-10089

v.                               District Judge Arthur J. Tarnow
                               Magistrate Judge R. Steven Whalen

ESPERION THERAPEUTICS, INC.,
ET AL.,

        Defendants.

_____ /

**OPINION AND ORDER GRANTING CLASS CERTIFICATION AND
APPOINTING CLASS REPRESENTATIVES AND
CLASS COUNSEL**

This is a securities fraud case brought under Sections 10(b) and 20(a) of the

Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange

Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. Before the Court is Plaintiffs'

Motion for Class Certification, and to Appoint Class Representatives and Class Counsel

[ECF No. 66], which has been referred for hearing and determination under 28 U.S.C. §

636(b)(1)(A). Plaintiffs define the proposed class as follows:

> "All persons who purchased or otherwise acquired the common stock of
> Esperion Therapeutics, Inc. between August 18, 2015 and September 28,
> 2015 (inclusive) and were damaged thereby.  Excluded from the Class are
> the Defendants; the officers and directors of the Company; memebers of
> their immediate families, their legal rpresentatives; their heirs, successors or
> assigns; and any entity in which Defendants have or had a controlling
> interest."

For the reasons discussed below, the motion will be GRANTED.

## I.    BACKGROUND

Defendant Esperion Therapeutics, Inc. ("Esperion") is a pharmaceutical company

that was engaged in the development of ETC-1002, a drug aimed at lowering high-density-lipoprotein cholesterol.  Defendant Tim M. Mayleben is Esperion's CEO and a member of its Board of Directors. As such, he was heavily involved in Esperion's efforts to secure Food and Drug Administration ("FDA") approval for ETC-1002.[1]  An important factor in determining the likelihood and time line for FDA approval was whether the FDA would require a cardiovascular outcomes trial ("CVOT"), a lengthy and costly study.  On August 11, 2015, Esperion had an End of Phase 2 Meeting ("EOP2 Meeting") with the FDA.  Six days later, on August 17, 2015 Esperion published a press release containing the following two statements:

> "The FDA confirmed that LDL-C remains an acceptable clinical surrogate endpoint for the approval of an LDL-C lowering therapy such as ETC-1002 in patient populations who have a high unmet medical need, including patients with [HeFH] ... or [ASCVD]."

> "Based upon feedback from the FDA, approval of ETC-1002 in the HeFH and ASCVD patient populations will not require the completion of a cardiovascular outcomes trial."

In its opinion reversing this Court's dismissal of the complaint[2],  the Sixth Circuit

---

[1] In *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 39 (1st Cir. 2008), the Court described the FDA's clinical trial process:

> "If approved by the FDA, human clinical trials proceed in three phases: Phase I studies generally involve twenty to eighty subjects, and are designed to determine how the drug works in humans and the side effects associated with increasing doses. [21 C.F.R.] § 312.21(a)(1). Phase II studies usually involve no more than several hundred subjects, and are designed to evaluate the effectiveness of the drug, as well as common short-term side effects and risks. Id. § 312.21(b). Phase III studies are large-scale trials, usually involving several hundred to several thousand subjects, and are intended to gather the information necessary to provide an adequate basis for labeling the drug. Id. § 312.21(c).... After Phase III, the FDA considers the results of all of the clinical trials in determining whether to approve a drug for market. See id. §§ 314.125(b), 314.126(a)."

[2] The Sixth Circuit held that this Court erred in finding that Plaintiffs had failed to show the element of scienter.

explained the import of Esperion's public statements:

> "These statements require some explanation to be fully understood in context. A cardiovascular outcomes trial (CVOT) is a costly, lengthy study that measures a drug's effectiveness in reducing cardiovascular risk over several years. Because lower LDL-cholesterol is presumed to improve overall heart health, the FDA does not typically require companies seeking approval of a new cholesterol-lowering drug to complete a CVOT and prove that the drug actually reduces cardiovascular risk. Instead, the FDA treats LDL-cholesterol as a "surrogate endpoint," or proxy, for cardiovascular risk. In other words, if a new drug is shown to lower LDL-cholesterol, the FDA assumes that it also improves overall cardiovascular health. *By saying that the FDA would continue to use LDL-cholesterol as a proxy for cardiovascular risk, and that the FDA would not require a completed CVOT prior to approving ETC-1002, Esperion was essentially telling its investors that ETC-1002 had a clear path to regulatory approval.*"

> *Dougherty v. Esperion Therapeutics, Inc*., 905 F.3d 971, 976 (6th Cir. 2018).

(Emphasis added).

Following this press release, Defendant Mayleben participated in a conference call with market analysts. In that call, he reiterated that the FDA would not require a CVOT in target populations.  The Sixth Circuit described Mayleben's statements:

> "In a follow-up conference call with market analysts, CEO Tim Mayleben stated that Esperion issued the release 'because we felt that some of the information we learned last week at our End-of-Phase II meeting about the regulatory path forward for [ETC-]1002 was important for you to know sooner rather than later, even *977 though we don't yet have meeting minutes back from the FDA.' Regarding the possibility of a CVOT, Mayleben said that '[w]e know that [ETC-]1002 will not require a CV outcomes trial to be completed prior to approval in patients with heterozygous FH and ASCVD, those patient populations that the FDA considers to have an appropriate benefit/risk ratio.' *Thus, Mayleben confirmed what Esperion had stated in its earlier press release—the company believed the FDA would not require a completed CVOT prior to approval of ETC-1002 for use in patients whose high cholesterol could not be managed using statins alone*. However, Mayleben indicated that the company still intended to conduct a CVOT at some point, in hopes that the FDA would later approve ETC-1002 for broader use in patients seeking an overall reduction in the risk of cardiovascular disease."

*Dougherty*, 905 F.3d at 976–77. (Emphasis added).[3]

However, the FDA's final minutes of the EOP2 Meeting were at odds with Esperion's press release and Mayleben's statements to the market analysts regarding the necessity of a CVOT.  When the minutes were released, Esperion issued another press release on September 28, 2015, stating, contrary to its earlier position, that the "FDA has encouraged the Company to initiate a cardiovascular outcomes trial promptly, which would be well underway at the time of the New Drug Application submission and review, since any concern regarding the benefit/risk assessment of ETC-1002 could necessitate a completed cardiovascular outcomes trial before approval."  In a subsequent conference call, Mayleben characterized Esperion's latest press release as "slightly different" than the language used in the August release.  As the Sixth Circuit observed, "Market analysts seized on this change in position, and Esperion's stock dropped 48% the next day, from $35.09 per share to $18.33 per share." *Dougherty*, 905 F.3d at 977.

The gravamen of Plaintiffs' complaint is that Esperion misled investors by falsely and publically stating on August 18, 2015 that the FDA would not require a CVOT before approval of ETC-1002, which had the effect of artificially inflating the trading value of

---

[3] The August press release also preemptively included cautionary language that it "contains forward-looking statements that are made pursuant to the safe harbor provisions of the federal securities laws."  Esperion was referring to the Private Securities Litigation Reform Act (PSLRA), which excludes from actionability statements that are "forward looking."  As the Sixth Circuit explained, "a defendant will not be liable for a material forward-looking statement if either (1) the statement is 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or (2) 'the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading....' However, the safe harbor does not extend to 'a statement of present or historical fact.'" *Id*. at 983.  The Sixth Circuit rejected Esperion's safe harbor argument, finding that "Esperion's statements were phrased as an observation of a historical fact." *Id*. at 984.

Esperion stock during the class period. When Esperion issued its second public statement following the release of the FDC final meeting minutes, Esperion stock plummeted, causing damage to the investors.  Plaintiffs now seek class certification.

## II.   STANDARD OF REVIEW

To certify a class, the Court must find that the plaintiffs have established the four requirements of Fed.R.Civ.P. 23(a): numerosity, commonality, typicality, and adequacy of representation. The plaintiffs must also establish at least one of the provisions of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Rule 23(b) provides:

**(b) Types of Class Actions**. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the

litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

The plaintiffs bear the burden of establishing the right to class certification. *Alkire v. Irving*, 330 F.3d 802, 820 (6ᵗʰ Cir. 2003). Rule 23 does not require the Court to inquire into the merits of the lawsuit when deciding the issue of class certification. *Beattie v. Century Tel., Inc*, 511 F.3d 554, 560 (6ᵗʰ Cir. 2007)(quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.")). Merits questions may be considered only to the extent that they are relevant to determining whether the Rule 23 prerequisites are satisfied. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The question of class certification is entrusted to the district court's discretion. *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011).

### III.   DISCUSSION

#### A.   Rule 23(a)

#### 1.   Numerosity

There is no particular number necessary to meet Rule 23(a)'s numerosity requirement, but numerosity "is generally assumed to have been met in class action suits involving nationally traded securities." *Wilkof v. Caraco Pharmaceutical Laboratories, Ltd.*, 280 F.R.D. 332, 338 (E.D. Mich. 2012)(quoting *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 479 (W.D. Mich. 1987)).  Esperion stock is nationally traded. A high average daily trading volume can support a finding of numerosity. *Id*. In *Wilkof*, daily volumes of between 88,590 and 100,000 shares was sufficient. Here, citing Esperion's response to its

-6-

Requests for Admission Nos. 36 and 37, Esperion's daily trading volume exceeded 1 million shares, and the average daily trading was greater than one percent of the total outstanding shares during the Class Period. The requirement of numerosity has been established.

### 2. Common Questions of Law and Fact

It is only required that there be a single issue of law and fact common to all class members. *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). The "mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). Here, there is clearly a common factual and legal issue that revolves around whether Esperion violated securities laws by making false and material public statements (and/or material omissions) that artificially inflated the value of Esperion stock, and if so, the extent to the Plaintiffs' damages. *See Wilkof*, 280 F.R.D at 338; s*ee also Willis v. Big Lots, Inc.*, 242 F.Supp.3d 634, 645 (S.D. Ohio 2017)("Whether Defendants made certain misrepresentations and omissions, whether such misrepresentations and omissions were material, and whether Defendants acted with the requisite scienter, are all common issues capable of classwide resolution.").

Plaintiffs have met the commonality requirement.

### 3. Typicality

A claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc*., 75 F.3d 1069, 1082 (6th Cir.1996). "[F]or the district court to conclude that the typicality requirement is satisfied, 'a

representative's claim need not always involve the same facts or law, provided there is a common element of fact or law.'" *Beattie*, 511 F.3d at 561 (quoting *Senter v. Gen. Motors Corp*., 532 F.2d 511, 525 n. 31 (6th Cir.1976)). In *Wilkof*, 280 F.R.D. at 338-39, the Court held that a class representatives claims are typical if they arise "from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Wilkof* found typicality where the plaintiffs "claim[ed] injury stemming from Defendant's alleged false representations and the effect of those false representations on the market." *Id*. at 341. So too in the present case, where the Plaintiffs claim injuries arising out of allegations that Esperion made false and misleading statements and omitted material facts that negatively effected the market to their detriment, Plaintiffs have sufficiently established typicality.

### 4. Adequacy of Representation

In *Young v. Nationwide Mut. Ins. Co*., 693 F.3d 532, 543 (6th Cir. 2012), the Court summarized Rule 23(a)(4)'s adequacy of representation inquiry as follows:

> "'The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citations and internal quotation marks omitted). This court looks to two criteria for determining adequacy of representation: '1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.' *In re Am. Med. Sys., Inc*., 75 F.3d at 1083 (citation omitted). This court also 'reviews the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation.' *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir.2000)."

Here, the class representatives/lead Plaintiffs, Wallace and Minett, are members of the class. Like all class members, they acquired Esperion common stock during the Class Period and allege that they suffered damages as the result of Esperion's material

misrepresentations and omissions. Their interests align with the interests of unnamed class members. As the Court found in *Wilkof*, 280 F.R.D. at 342, "Plaintiffs, like the unnamed members of the class, have an interest in redressing said financial injury." The lead Plaintiffs have diligently and aggressively pursued this action from its inception. As their counsel states in this motion, ECF No. 66, PageID.1641-1642:

> "Lead Plaintiffs, through Lead Counsel, have vigorously prosecuted this action since 2016 by, *inter alia*, ( i ) investigating this matter and filing the Complaint; (ii) prevailing before the Sixth Circuit Court of Appeals; (iii) reviewing pleadings prior to submission to the Court; and (iv) aggressively pursuing discovery from parties and non-parties."

A critical part of the adequacy inquiry is the competence of class counsel. "The Sixth Circuit appears to focus on the adequacy of plaintiff's counsel and whether plaintiff has a conflicting interest, not the personal qualifications of the named plaintiff." *Rankin v. Rots*, 220 F.R.D. 511, 520 (E.D. Mich. 2004). *See also In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 326, 338-39 (E.D. Mich. 2001)("Adequacy of representation merely requires that the class representative's attorney be qualified, and that the class representatives not have interests conflicting with the class in the litigation at hand."

Esperion apparently does not question the competence of class counsel, nor do I. Apart from counsel's diligent prosecution of this case to date, including a win in the Sixth Circuit, the attorneys for lead Plaintiffs have significant collective experience in class litigation.

I am therefore satisfied that Plaintiffs have met all four requirements of Rule 23(a).

## B.    Rule 23(b)

Here, the operative inquiry lies within Rule 23(b)(3), which requires that ( i ) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy."

### 1.  Predominance

Just as the general question of class certification does not require an assessment of the merits, so too the determination of predominance does not require an analysis of the Plaintiffs' proofs. The question is whether class-wide questions of law and fact *predominate* over individual claims, not whether they will ultimately be proved in Plaintiff's favor.  In *Amgen v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455 (2013), the Supreme Court, addressing the element of the materiality of a defendant's statement in a securities fraud action, held:

> "Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members." *Id*. at 469 (emphasis in opinion)(internal quotations and punctuation omitted).

*See also In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig*., 722 F.3d 838, 858–59 (6th Cir. 2013).

The elements of an action under § 10(b) and Rule 10b–5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011)(quoting *Stoneridge Investment Partners, LLC v. Scientific–Atlanta,* Inc., 552 U.S. 148, 157 (2008).[4] Questions regarding Esperion and Mayleben's statements, their materiality, scienter, and damages are common

---

[4] However, proof of loss causation is not required at the class certification stage. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011)("The question presented in this case is whether securities fraud plaintiffs must also prove loss causation in order to obtain class certification. We hold that they need not.").

to all putative class members, and would be subject to class-wide proof.  Indeed, in *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997), the Supreme Court observed that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."

With respect to the element of reliance, a securities fraud action against a publically traded company such as Esperion brings into play the "fraud on the market" theory. In *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court held that reliance could be shown by a rebuttable presumption that the price of stock traded in an efficient market reflects all public, material information–including material misrepresentations–and that investors who buy or sell stock at the market price are deemed to have relied on those statements.  *Basic* noted that requiring proof of individual reliance from every securities fraud plaintiff "effectively would...prevent [plaintiffs] from proceeding with a class action," and "individual issues then would...overwhelm[] the common ones."  *Id*. at 242.  *See also Amgen*, 568 U.S. at 463 ("The fraud-on-the-market theory, however, facilitates class certification by recognizing a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market."). To invoke the fraud on the market presumption of reliance, a plaintiff must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."  *Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 268 (2014). "[S]ecurities traded in national secondary markets...are wll suited for application of the fraud on the market theory." *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990).

While it is not necessary for Plaintiffs to prove all of the elements at the class certification stage, *Amgen*, 568 U.S. at 459, they have pled and supported all of the factors necessary to invoke the fraud on the market presumption. Esperion's press releases and Mayleben's statements to the market analysts were public statements; the statements were material and the release of the second press release, that contradicted the first, was immediately followed by a precipitous decline in the value of Esperion's stock; and the class is defined as investors who traded in Esperion stock between the two conflicting public statements.

Plaintiffs have pointed to several factors supporting the claim that Esperion traded in an efficient market. Esperion's stock traded on the NASDAQ. *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011)("[L]isting of a security on a major exchange such as the NYSE or NASDAQ weighs in favor of a finding of market efficiency"). The Plaintiffs also point to the five factors discussed in *Cammer v. Bloom*, 711 F.Supp. 1264, 1286-87 (D.N.J. 1989). Those factors are (1) the stock's average trading volume; (2) the number of analysts following and reporting on the stock; (3) the number of market makers; (4) eligibility to file an S-3 Registration Statement; and (5) the reaction of the stock price to unexpected news events.  *Id*. Based on the report of their expert, Chadd Coffman, Plaintiffs proffer evidence that Esperion stock had a high trading volume during the Class Perios (29.76%); that eight different analysts covered Esperion, issuing at least 16 reports during the class period; that *Bloomberg* noted 60 market makers for Esperion stock during the Class Period (citing *Wilkof*, 280 F.R.D. at 344, holding that greater than 10 market makers supported a "substantial presumption" that the market was efficient); that Esperion was not only eligible to file an S-3 Form, but in fact did so before and after the Class Period. Finally, based on Mr. Coffman's report, which included an

event study, "Esperion's common stock reacted rapidly to new and unexpected information, demonstrating a clear cause-and-effect relationship between material news and the market price of Esperion common stock, further evidencing market efficiency." ECF No. 66, PageID.1649.

The parties have expended much effort discussing and disputing the application of the fifth *Cammer* factor, whether it has been met, and whether it matters if it has or has not been met. In fact, it doesn't matter. "[N]o court has adopted a per se rule that any on *Cammer* factor is dispositive." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320-21 (S.D.N.Y. 2016). Numerous Courts within the Sixth Circuit have held that market efficiency can be established without regard to the fifth *Cammer* factor. *See In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910, *10 (W.D. Tenn. 2006)(even if plaintiffs failed to establish *Cammer* 5, "this alone would not negate the efficiency of the market"); *Zwick Partners, LP v. Quorum Health Corp.*, 2019 WL 1450546, *13 (M.D. Tenn. 2019)(market efficiency established without reference to *Cammer* 5); *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, *9 (M.D. Tenn. 2017)(same); *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 454 (S.D. Ohio 2009)(same).

More importantly, Esperion has conceded that there is evidence showing market efficiency. In its response to Plaintiff's Request for Admission No. 45 (Plaintiffs' Exhibit 10, ECF No. 66-10, PageID.1765, Esperion admits "that the volume of trading in Esperion's common stock supports a finding that the market was efficient during the Class Period."

Finally, there is the issue of whether class-wide damages claims predominate over individual claims. In *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), the Supreme Court held that a model supporting a claim for damages must be consistent with the

plaintiff's theory of liability:

> "If respondents prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3). Calculations need not be exact, see *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931), but at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.' ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)."

Citing the report of Mr. Coffman, their expert, Plaintiffs state their damages theory

as follows:

> "Here, there is only one theory of liability and damages–Defendants' fraudulent misstatements and omissions concerning the EOP2 Meeting artificially inflated Esperion's stock price, causing Class members out-of-pocket damages when that inflation was removed as the truth emerged." *Plaintiffs' Reply Brief*, ECF No. 98, PageID.3563.

Plaintiff's theory of damages is completely congruent with its theory of liability,

and has been accepted as not barred by *Comcast* in other cases. For example, in *In re NII*

*Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 413–14 (E.D. Va. 2015), where the plaintiffs

model of damages was also based on Mr. Coffman's analysis, the Court stated:

> "Lead Plaintiffs provide adequate detail regarding a method for calculating classwide damages and measuring the artificial inflation of each share on a given day. Coffman Report ¶¶ 138, 139. The method offered by Lead Plaintiffs is widely accepted as the *414 traditional measure of damages for Rule 10b-5 actions. See, e.g., *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) ("In our view, the correct measure of damages ... is the difference between the fair value of all that the mixed-blood seller received and the fair value of what he would have received had there been no fraudulent conduct."). There is no convincing demonstration by the defendants that this damages theory does not closely hew to Lead Plaintiffs' theory of liability or that such a theory could not be applied class-wide. Accordingly, Lead Plaintiffs'

damages model supports a finding of predominance."

In *Kasper v. AAC Holdings, Inc.*, 2017 WL 3008510, *14 (M.D. Tenn. 2017), the

Court, again based on Mr. Coffman's methodology, found that *Comcast* did not preclude

a finding of predominance as to damages:

> "The Court finds that Plaintiffs have satisfied *Comcast*. Specifically,
> Plaintiffs' expert used an event study to calculate damages on a classwide
> basis. (See Coffman Expert Rebuttal, ECF No. 109-4 at PageID 3606;
> Coffman Report, ECF No. 80-4 at PageID 2780.) *The Court finds that the
> proffered methodology is often viewed by courts as consistent with
> Plaintiffs' theory of liability based on misrepresentations or omissions in
> securities litigation.* See, e.g., *Hatamian v. Advanced Micro Devices, Inc*.,
> No. 14-CV-226 YGR, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016);
> *Willis v. Big Lots, Inc*., No. 2:12-CV-604, 2017 WL 1063479, at *11 (S.D.
> Ohio Mar. 17, 2017); *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y.
> 2014); *In re Wilmington Trust Sec. Litig*., 310 F.R.D. 243, 246 (D. Del.
> 2015); *see also In re VHS of Mich., Inc*., 601 Fed.Appx. 342, 344 (6th Cir.
> 2015) ('*Comcast* applies where multiple theories of liability exist, those
> theories create separable anticompetitive effects, and the combined effects
> can result in aggregated damages.... Where there is no chance of aggregated
> damages attributable to rejected liability theories, the Supreme Court's
> concerns do not apply.'). Accordingly, the Court finds that individual
> damages issues will not predominate over common issues in this case."
> (Emphasis added).

And in *Rooney v EZCORP, Inc*, 330 F.R.D. 439, 451 (W.D. Texas 2019), the

Court reviewed Mr. Coffman's event study and regression analysis (the methodology

used in the present case), and concluded that the plaintiffs' calculation of damages was

capable of measurement on a class-wide basis:

> "As far as the Court can discern, this analysis quite clearly articulates the
> means by which Coffman intends to go about calculating damages on a
> classwide basis. And given Defendants' complete failure to expand on any
> of their extremely conclusory complaints regarding Coffman's report, the
> Court concludes that Plaintiff's theory of damages is consistent with the
> proposed theory of liability and that Plaintiff has established the calculation
> of damages is a common question susceptible of measurement on a
> classwide basis."

Thus, *Comcast* is not an impediment to a finding that class-wide damages issues

predominate for purposes of class certification.[5]

## 2.   Superiority

In a securities fraud case involving nationally traded stock, where there are numerous individual potential plaintiffs, and where each individual's recovery might be relatively small, a class action is the preferred litigation model.  In *Beattie v. CenturyTel, Inc.*, 511 F.3d at 567, the Sixth Circuit stated:

> "One factor to consider in determining whether the superiority requirement of Rule 23(b)(3) is satisfied are 'the difficulties likely to be encountered in the management of a class action.' Fed.R.Civ.P. 23(b)(3). In [*Amchem Products, Inc.*] *v. Windsor*, the Supreme Court explained that litigation should be brought as a class action if individual suits would yield small recoveries. The Court stated that  '[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'  521 U.S. at 617, 117 S.Ct. 2231 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir.1997))."

The number and geographical diversity of the class members, along with the relatively small recovery available in each individual case, augurs in favor of class certification. In addition, trying the common issues in this case to a single jury saves time and judicial resources, and guards against the possibility of inconsistent verdicts. "Resolving the issues in one fell swoop would conserve the resources of both the court and the parties." *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405, 417 (6th Cir. 2018).  And district courts, including this Court, do not lack experience and expertise in trying securities fraud cases as class actions.

Plaintiffs have satisfied the requirements of Rule 23(a) as well as Rule 23(b)(3).

---

[5] Attached to Plaintiffs' Reply Brief as Exhibit B is a list of 61 cases where district courts have certified classes post-*Comcast* based on damages models similar to Mr. Coffman's.

**C.    Appointment of Class Representatives and Class Counsel**

For the reasons discussed in Section III-A-4, above, it is appropriate to appoint the

Lead Plaintiffs as Class Representatives, and to appoint their attorney as Class Counsel.

## IV.    CONCLUSION

Plaintiffs' Motion for Class Certification, and to Appoint Class Representatives

and Class Counsel [ECF No. 66] is GRANTED.

The Court certifies the Class as:

All persons who purchased or otherwise acquired the common stock of
Esperion Therapeutics, Inc. between August 18, 2015 and September 28,
2015 (inclusive) and were damaged thereby.  Excluded from the Class are
the Defendants; the officers and directors of the Company; memebers of
their immediate families, their legal rpresentatives; their heirs, successors or
assigns; and any entity in which Defendants have or had a controlling
interest.

Lead Plaintiffs are appointed as Class Representatives, and Kahn Swick & Foti,

LLC and Robbins Geller Rudman & Dowd, LLP are appointed as Class Counsel.

IT IS SO ORDERED.

s/R. Steven Whalen
R. STEVEN WHALEN
United States Magistrate Judge

Dated: May 31, 2020

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on
May 31, 2020 electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager

-17-

-18-